**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 14-cv-03084-RM-KLM

Timothy Gonzales,

   *Plaintiff*,

   *v.*

Correctional Health Partners, LLC a/k/a Physician Health Partners,
CoreCivic, Inc. f/k/a Corrections Corporation of America, and
Dr. Jennifer Mix, individually,

   *Defendants*.

---

**ORDER**

---

Prisoner Plaintiff Timothy Gonzales alleges that injuries to his left knee were left untreated negligently and with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Defendant CoreCivic, pursuant to a contract with the Colorado Department of Corrections (CDOC), operates as the Bent County Corrections Facility (BCCF), where Gonzales is incarcerated. Defendant Correctional Health Partners (CHP) also contracts with CDOC and provides administrative services determining the medical necessity and propriety of treatment requests by medical providers on behalf of inmates at BCCF. Defendant Dr. Mix is a review manager and chief medical officer at CHP.

This case is in its fifth year and on its fifth amended complaint. The five remaining claims are these: alleged (I) Eighth Amendment violation by Mix; (II) Eighth Amendment Violation by CoreCivic; (III) Eighth Amendment violation by CHP; (IV) Negligence by CHP and Mix; and (V) Negligence by CoreCivic. Defendants seek summary judgment on all claims. (*See* ECF Nos. 189, 193, 211, 213, 221, 224.)

## I.    BACKGROUND

### a.    Obtaining Special Medical Treatment for BCCF Inmates

This case focuses on the process by which inmates obtain specialized medical treatment outside prison walls. Operating as BCCF, CoreCivic provides medical care on the inside and is usually the first point of contact for incarcerated inmates requiring treatment. (CSUMF ¶¶ 1–3.)[1] CHP is a private entity that furnishes third-party medical administrative services related to prisoner care—including establishing policies and procedures for the review and authorization for specialized treatment. (CSUMF ¶¶ 4, 6.)[2] Except in emergencies or other circumstances not relevant here, to schedule an inmate with a provider outside prison walls, CoreCivic staff, or outside care providers (as the case may be), must submit a "prior authorization request" to CHP for approval. (CSUMF ¶¶ 4, 7.)[3]

After receiving such a request, a CHP care management coordinator reviews it for completeness. (MSUMF ¶ 8.) Among other things, a complete request includes information concerning the prisoner's diagnosis or symptom and its duration; the service requested and data supporting it; any more conservative therapies that have been tried or were insufficient; any previous diagnostic results; compliance with standard care guidelines; the functional impact of

---

[1]    "CSUMF" means the "Statement of Undisputed Material Facts" filed in support of CoreCivic's motion for summary judgment, as updated at ECF No. 224-1. "R-CSUMF" refers to Gonzales's additional facts appended to CSUMF. "MSUMF" means the "Statement of Undisputed Material Facts," filed in support of CHP and Mix's joint motion for summary judgment, as updated at ECF No. 221. "R-MSUMF" refers to Gonzales's additional facts appended to MSUMF. To the extent that both motions present identical undisputed facts, the Court cites to the statement of most convenience, without prejudice to the statements provided supporting or rebutting the other motion.

[2]    CDOC pays CHP a per-inmate, per-month rate based on the number of prisoners it covers. (R-MSUMF ¶ 2.) If CHP lowers the costs paid by CDOC for all outside, special, ancillary, hospital, and professional healthcare, CDOC shares the savings with CHP. (R-MSUMF ¶ 4.) Simultaneously, there is a "cost savings plan disincentive" that requires CHP to pay CDOC if certain medical expenditures increase. (R-MSUMF ¶ 5.)

[3]    Generally, a prior authorization request is a request for medical care or services requiring review of an administrator before those services may be rendered. (MSUMF ¶ 5.) Prisoners do not submit prior authorization requests on their own behalf.

providing the service; and relevant medical history. (R-CSUMF ¶ 89.)[4] A complete request is reviewed by a nurse manager. (MSUMF ¶ 9.) If a nurse manager does not approve the request, it is reviewed by a medical director, such as Defendant Dr. Mix,[5] who considers the request against nationally recognized, evidence-based guidelines for determining appropriate care. (MSUMF ¶¶ 11, 54–55; R-MSUMF ¶¶ 12–14.)[6] Through this process, CHP does not examine patients directly,[7] but reviews and approves or denies requests based on CDOC-approved clinical criteria, national guidelines, and the submitted information. (CSUMF ¶ 6; MSUMF ¶ 59.) If CHP denies a prior authorization request for any reason—for example, if it decides the inmate has yet to undergo more conservative treatment—it returns the request to the provider, who may appeal the decision. (CSUMF ¶ 8; MSUMF ¶ 12.) Following a second denial, a provider may appeal further to the CDOC chief medical officer, who has final decision-making authority and can override any decision made by CHP. (CSUMF ¶ 9; MSUMF ¶¶ 67–69.)

### b. Gonzales's Injuries and Treatment

Plaintiff Gonzales transferred to BCCF on February 17, 2011. (CSUMF ¶ 10; MSUMF ¶ 1.) On April 25, 2011, he visited the BCCF medical department after twisting his left knee playing basketball. CoreCivic staff gave him ibuprofen and instructed him to rest, rotate, ice, and use analgesic balm. (CSUMF ¶¶ 11.) Eight months later, on January 13, 2012, he returned to the medical department complaining of swelling and abnormal growth in the same knee. He told the

---

[4]  If a request remain incomplete for ten days, CHP administratively denies it. (R-CSUMF ¶ 90; R-CSUMF ¶ 121.) CHP used to keep incomplete requests open for forty-five days, but had to shorten the time period in 2017 because "[its] care management nurses were spending a lot of time and effort to request additional information that should have been provided with [an] initial request." (R-CSUMF ¶ 121; R-MSUMF ¶ 15.) CHP policy previously required case managers to make two requests for additional information but now only requires that they make one. (R-MSUMF ¶ 16.)

[5]  Dr. Mix is one of CHP's medical directors and the chief medical officer. (MSUMF ¶¶ 13–14.)

[6]  CHP receives approximately 1,000 requests for prior authorization per month from medical providers requesting treatment for CDOC prisoners (including at institutions other than BCCF). Dr. Mix processes anywhere from 100–300 of those requests per week. (R-MSUMF ¶ 11.)

[7]  Neither CHP nor Dr. Mix provides any direct medical care to inmates. (*See* MSUMF ¶¶ 60–61.)

nurse that "this is a chronic issue he has had since a teenager" known as "Osgood Schlatter's Disease," which is "intermittent" and "possibly aggravated by lifting weights." (CSUMF ¶ 12.)

On January 18, 2012, Rachel Scobee, a CoreCivic primary healthcare provider, discussed knee x-ray results with Gonzales and submitted a prior authorization request to CHP for an MRI, which CHP approved. (CSUMF ¶ 13; MSUMF ¶ 17.) The MRI indicated "Chronic Osgood-Schlatter lesion, possible tear of meniscus and mild associative degenerative change; possibly mild iliotibial ('IT') band syndrome." (CSUMF ¶ 14.) On May 31, 2012, Scobee provided Gonzales with a Velcro strap knee brace, and instructed him to continue with ibuprofen, rest, ice, and not play sports. (CSUMF ¶ 15.) She also submitted another prior authorization request to CHP for him to see an orthopedist, which CHP approved. (CSUMF ¶¶ 15–16; MSUMF ¶¶ 18–19.) On July 12, 2012, Gonzales orthopedic specialist Dr. Alex Romero, who diagnosed him with IT band syndrome, Osgood Schlatter's Disease with overlying pre-patellar bursitis, and possible medial meniscus tear, which he characterized as "not distinctly present on MRI." Dr. Romero proposed a knee strengthening program and a cortisone injection but did not recommend surgery. (CSUMF ¶ 16.)

In August 2012, Gonzales reinjured his knee playing basketball. (CSUMF ¶ 18.) On October 12, 2012, he reported this new injury to Scobee, who submitted a prior authorization request to CHP for a second MRI, which CHP approved. (CSUMF ¶¶ 19–20; MSUMF ¶ 20.) The second MRI revealed "compartment degenerative change with lateral meniscus tear and [ACL] tear, possibly with partial tear of condylar fibular component of lateral collateral ligament complex." (CSUMF ¶ 20.) Scobee reviewed these MRI results with Gonzales and submitted a prior authorization request to CHP for a second visit to Dr. Romero. (CSUMF ¶ 21.)

Dr. Romero saw Gonzales two weeks later, on February 5, 2013. His report from that day relays that Gonzales described "sensations of pain and instability as well as swelling essentially all the time [and an inability] to do many things including ascending and more likely descending stairs." The evaluation continues that "[t]he contralateral knee has good muscular development. The skin is intact. There is full range of motion without swelling or tenderness to palpation. There is no instability. There is a normal neurovascular examination." The assessment notes that Gonzales wished to stay athletically active with running, jumping, and cutting sports. At this point, Dr. Romero first recommended reconstruction surgery, and his office submitted a prior authorization request for the operation. But CHP (via Dr. Mix) denied the request, stating, "based on the information provided he has good functional capacity. Therefore this is not medically necessary." (CSUMF ¶ 24; MSUMF ¶¶ 24–26; ECF No. 192-2, at 5; ECF No. 212, at 6.) Dr. Romero did not appeal CHP's decision. (CSUMF ¶ 26.)[8] He later testified that he did not dispute the propriety of CHP's decision:

> When I make a recommendation, then that is submitted. I don't understand how the Department of Corrections and CHP work, so my assumption was that they made a determination whether or not they felt it was necessary. My specialty, especially in Mr. Gonzales' case, is for an elective surgery. I don't treat cancer. I don't treat heart disease. Nothing that I do is life threatening. It's all about quality of life. And so my assumption with the Department of Corrections is that they make a determination whether or not that that inmate, slash, patient deserves that quality of care.

(CSUMF ¶¶ 78–79.)

On July 8, 2013, Scobee gave Gonzales a cortisone shot and submitted another prior authorization request for an offsite orthopedic visit, but CHP administratively denied it for being

---

[8]   Dr. Romero instructs his staff to submit prior authorization requests to CHP, together with all of the necessary documentation. He does not review these requests before they are submitted. (R-CSUMF ¶ 94; R-MSUMF ¶ 20.)

incomplete. (CSUMF ¶¶ 27–28; R-CSUMF ¶ 95; MSUMF ¶ 32.) Scobee gave Gonzales more cortisone injections on February 21 and April 11, 2014 and submitted another prior authorization request to CHP for him to see an orthopedist. (CSUMF ¶¶ 30–31.) On April 14, she called the chief medical officers at CHP and CDOC, seeking to have CHP's prior surgery denial overturned. (CSUMF ¶ 32.) This time, CHP approved the surgery. (MSUMF ¶ 37.) On May 9, 2014, Gonzales underwent ACL and meniscus tear surgery on his left knee. (CSUMF ¶ 34.) During a May 22, 2014 follow-up visit, Dr. Romero diagnosed Gonzales with "posttraumatic arthritis [that would] likely lead to a knee replacement at a relatively young age." (CSUMF ¶ 36.) He testified that the delay in surgery likely contributed to Gonzales's osteoarthritis, insofar as that delay afforded Gonzales more time to experience instability episodes through continued use—including in everyday activities and participation in sports. (R-CSUMF ¶ 97.) On August 7, 2014, Dr. Romero aspirated his knee and gave him a cortisone injection. (CSUMF ¶ 37.) After his operation, Gonzales saw CoreCivic providers at BCCF for additional follow-ups in July, August, and September of 2014. (CSUMF ¶ 38.)

On September 16, 2014, CHP approved another outside visit. (MSUMF ¶¶ 38–39.) Dr. Romero aspirated Gonzales's left knee again, gave him another cortisone injection, and noted that he "may benefit from vicosupplementation." (CSUMF ¶ 39.) He submitted a prior authorization request for Synvisc-One (Synvisc)—medication "like giving a lubrication shot or oil change to the knee." (CSUMF ¶¶ 40–41; MSUMF ¶ 41.) On December 1, 2014, CHP (via Dr. Stephen Krebs) denied that request, stating, "Synvisc is FDA approved for [degenerative joint disease] of the knee. It is not approved for Rx after knee reconstruction." (CSUMF ¶ 41; MSUMF ¶ 41.)

On November 18, 2014, Gonzales saw Dr. Timothy Creany, CoreCivic's new primary medical provider at BCCF, who noted that Gonzales had "advanced [osteoarthritis] in his left knee." He also surmised that Gonzales would need total knee replacement surgery at some point "but will need to delay this as long as possible given the finite life of an artificial joint." He prescribed Gonzales naproxen "to try a different medication to help his pain." (CSUMF ¶ 42.)

On January 12, 2015, Gonzales saw nurse practitioner Jayne Scharff at BCCF, reporting significant pain following further physical injury to his knee. Scharff observed him walking without difficulty and did not give him the cane or crutches he requested. However, she submitted a prior authorization request for an MRI. (CSUMF ¶ 43.) CHP denied that request, stating that "there was no clinical information provided. There was no history of present illness, there was no exam, there were no plain films, there was no assessment, [and] there was no failed conservative therapy." (MSUMF ¶ 44; CSUMF ¶ 44.) After this denial, Dr. Creany explored whether he could administer Synvisc without CHP's approval. He ultimately obtained clearance from CHP and gave Gonzales a Synvisc shot at BCCF on April 16, 2015, which relieved some of his pain. (CSUMF ¶¶ 45–46; R-CSUMF ¶ 98.)

From May 4, 2014 to January 12, 2016, BCCF medical staff gave Gonzales different medications to treat inflammation and pain, including at least three steroid shots. (CSUMF ¶ 51.)[9] On November 30, 2015, Dr. Creany requested Synvisc for Gonzales again, but CHP denied it. (CSUMF ¶ 48.) Dr. Creany advised Gonzales of this denial and submitted a new prior authorization request seeking a referral to an orthopedic specialist, hoping that the orthopedist could get Synvisc approved. (CSUMF ¶ 49.) On January 7, 2016, CHP denied that request with

---

[9]    The steroid used, kenalog, is less expensive than Synvisc. (R-CSUMF ¶ 101.)

an indication that Synvisc was "not medically necessary" because it did not "alter the disease process." (CSUMF ¶ 50; MSUMF ¶ 47.)[10]

On January 22, 2016, Gonzales reported to Dr. Creany that he had slipped and hurt his knee again, and Dr. Creany submitted yet another prior authorization request to CHP for an MRI. (CSUMF ¶ 52.) CHP denied this request, citing a lack of documentation, but CoreCivic successfully appealed it. (CSUMF ¶¶ 53–54; MSUMF ¶¶ 48–49.) This latest MRI revealed that Gonzales had completely torn his surgically repaired ACL, and CHP approved his subsequent request to follow up with Dr. Romero. (CSUMF ¶ 55–56.) On May 3, 2016, Dr. Romero gave Gonzales a steroid shot, an x-ray, and a hinged knee brace. (CSUMF ¶ 56.) CoreCivic staff confiscated the brace because it contained metal and therefore violated security policy—which requires approval of the CDOC chief medical officer before inmates may have certain medical equipment, including "any leg braces containing metal." (CSUMF ¶¶ 57–58.) CDOC did not approve the brace in this instance. (CSUMF ¶ 59.)

On June 17, 2016, Dr. Romero submitted a prior authorization request to CHP for Synvisc. (CSUMF ¶ 56.) CHP initially denied the request, but CoreCivic successfully appealed, and Dr. Romero gave Gonzales the injection on November 7, 2016. (CSUMF ¶ 61.)[11] On February 14, 2017, Dr. Creany gave Gonzales a cortisone/kenalog injection. (CSUMF ¶ 62.) On April 21, 2017, Dr. Romero submitted another prior authorization request for Synvisc, but CHP denied it with an indication Gonzales could follow up with his primary care provider. (CSUMF ¶

---

[10]   Gonzales does not dispute that this was the stated reason for the denial but disputes the inferred conclusion that in order for something to be medically necessary it must alter the disease process. (*See* MSUMF ¶ 47 (citing to deposition of Dr. Romero, where he states that Synvisc is useful for decreasing inflammation and pain but he is "skeptical" of certain claims about Synvisc's ability to alter the disease process).)

[11]   Gonzales points out that CoreCivic technically has the authority to appeal a denied prior authorization request on behalf of an outside provider like Dr. Romeo, but Dr. Creany testified that it is ordinarily up to the provider requesting care to initiate any appeal, and CoreCivic maintains that Dr. Creany's appeal of this denial was extraordinary. (See R-CSUMF ¶ 93.)

63; MSUMF ¶¶ 52–53.) Dr. Creany gave Gonzales Synvisc injections on August 17, 2017 and March 1, 2018. At present, Gonzales receives regular Synvisc injections. (CSUMF ¶¶ 65, 67.)

In all, from 2013 to 2017, CHP denied eight prior authorization requests related to Gonzales's care—four of which were submitted by Dr. Romero and four by CoreCivic staff. Of the eight, only two were appealed (both by CoreCivic), and both appeals were successful. (R-CSUMF ¶ 92.)

### c. Gonzales's Pain Management, Activity, and Grievances

Gonzales maintains that between April 2011—when he first injured his knee—and the present, he has experienced, and continues to experience, pain and instability, including popping, buckling, grinding, aching, and ligaments catching that he has continuously reported to CoreCivic. (R-CSUMF ¶¶ 80, 82.) During this time, he took various pain relievers that did not fully eliminate the pain. (R-CSUMF ¶ 88.) His daily life required walking up to a quarter of a mile, going up and down stairs, and using a ladder to get into his bunk. (R-CSUMF ¶ 81.) According to him, it often hurt to bend, put weight on, or touch his knee. Even so, Gonzales's testimony and medical records indicate that he continued to regularly lift weights (including leg exercises) and has been able "to be active with minimal pain." (R-CSUMF ¶ 80.) He also plays basketball as his knee can tolerate. (R-CSUMF ¶ 85.)

Although he was not personally able to appeal CHP's denials of prior authorization requests, Gonzales was able to—and did—submit grievances through CDOC's administrative processes. (CSUMF ¶ 68.) A common complaint of his was that CoreCivic would tell him that he would be scheduled with a provider, but he would have to wait for several weeks or months. (R-CSUMF ¶ 83.) Another typical grievance revolved around him being told he would have to pay for his own treatment. (CSUMF ¶ 71.) For example, on March 27, 2013, Gonzales submitted

a "kite"[12] regarding the denied surgery request. (CSUMF ¶ 25.) For another, on June 3, 2013, a health services administrator responded to one of his Grievances by telling him, "[y]ou are scheduled to see a provider 6/25/2013. Your surgery was denied 2/18/2013 based on information provided he has good functional capacity. Therefore this is not medically necessary . . . [and] you may seek treatment at your own expense." (CSUMF ¶ 71; *see also id.* at ¶¶ 73–77 (additional grievances).)

### d. CoreCivic's and CHP's Statistics

There is some dispute over whether CoreCivic maintained the required number of medical personnel at BCCF during all relevant times pursuant to its contract with the CDOC, which Gonzales submits caused delays in prisoners obtaining prompt medical treatment. (*See* R-CSUMF ¶¶ 113–16.) From 2011 to 2018, CoreCivic was assessed $107,755.56 in contractual liquidated damages remedies for gaps in medical staffing, which occurs when BCCF fails to have the requisite number of medical personnel clocked in for the required number of hours per shift. (R-CSUMF ¶ 112.) From 2011 to the present, CHP received 4,814 prior authorization requests on behalf of prisoners at BCCF—1,014 of which were ultimately denied. (R-CSUMF ¶ 117.) From April 2011 to February 25, 2019, CoreCivic staff submitted at least 161 appeals of CHP denials. (R-CSUMF ¶ 118.)[13]

---

[12] A medical "kite" is an inmate's written request for medical attention. (R-CSUMF ¶ 111.)

[13] This figure includes appeals submitted on behalf of inmates at Crowley County Correctional Facility.

Additionally, Gonzales has filed a substantial volume of prisoner grievances from BCCF and other facilities for the proposition that "other prisoners at CoreCivic facilities have experienced delay in receiving medical care or have been unable to obtain the treatment they believe necessary." (R-CSUMF ¶ 123; *see also, e.g.*, R-MSUMF ¶¶ 33–46.) Whether or not these documents fairly demonstrate delay, or may be read for the truth of the matters asserted therein, CoreCivic is aware of at least some complaints to that effect. (R-CSUMF ¶ 124.) It appears that Gonzales would have this Court accept accumulated, isolated complaints of delay as evidence for the truth of CHP's general sloth in, or reticence to, approving healthcare. To the extent any of these complaints are even relevant to this case, they are hearsay if being used for that purpose. However, they may be admissible for another purpose, such as to prove the effect they had on CHP. *See United States v. Lambinus*, 747 F.2d 592, 597 (10th Cir. 1984) (finding statements offered for their effect on listener are not hearsay).

## II. ANALYSIS

In this action, Gonzales alleges that Defendants' delay of medical treatment represents deliberate indifference to his serious medical needs that resulted in years of unnecessary excruciating pain and ultimately left him with lifelong mobility issues. Defendants seek summary judgment on all claims.

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Barney v. Pulsipher*, 143 F.3d 1299, 1306–07 (10th Cir. 1998). The moving party does not have to negate the non-movant's claims in order to obtain summary judgment. *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). The movant only bears the initial burden of "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996). For the reasons that follow, the Court grants summary judgment in Defendants' favor.

### a. The claims against CoreCivic are time-barred (Counts II and V).

Gonzales filed this case on November 14, 2014 but did not add CoreCivic as a defendant until his January 12, 2018 fifth amended complaint. (*See* ECF No. 136.) CoreCivic answered on April 6, 2018 and sought to amend its answer to include a statute of limitations defense on December 11, 2018. (ECF Nos. 154, 184.)[14] The magistrate judge granted CoreCivic's motion,

---

[14] The motion followed the initial discovery deadline set after CoreCivic's entry in to the case, but preceded the actual close of discovery by several months. (*See* ECF No. 225, at 2, n.2 (recounting expanding discovery deadlines).)

and Gonzales objected. (ECF Nos. 225, 233.) Before turning to the merits of this defense, the Court addresses whether leave to amend was properly granted.

### i.     Objection to CoreCivic's Invocation of the Limitations Defense

The Court generally agrees with decision of the magistrate judge. (ECF No. 225.) Because no deadline to amend pleadings was ever formally set in this case, this inquiry begins and ends with Federal Rule of Civil Procedure 15, which provides for amendment with the Court's leave—which should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971) ("[T]he grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court.").  As the Supreme Court has explained, Rule 15 "was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result." *United States v. Hougham*, 364 U.S. 310, 316 (1960). Thus,

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

Without suggesting that he would be prejudiced by it, Gonzales opposes the amendment on the basis of undue delay alone and incorrectly suggests that the magistrate judge's primary focus on other factors—such as the absence of prejudice—represents a misapplication of the law. (*See generally* ECF No. 233.) Citing *Minter v. Prime Equipment Co.*, he urges that the Tenth Circuit "focuses primarily on the reasons [(or lack thereof)] for the delay" proffered by the

movant, rather than any attendant prejudice the delay does or does not cause to the opposing party. (ECF No. 233, at 13 (quoting 451 F.3d 1196, 1206 (10th Cir. 2006)).) But even though courts may focus chiefly on the movant's explanation within the confines of the undue delay consideration, the Tenth Circuit has not departed—in *Minter* or elsewhere—from the established principle that the "most important[] factor in deciding a motion to amend the pleadings[] is whether the amendment would prejudice the nonmoving party." *Minter*, 451 F.3d at 1207; *see also Hougham*, 364 U.S. at 316. In this instance, the magistrate judge understood the relevant inquiry, properly considered the absence of prejudice, and was not incorrect in finding that whatever delay occurred was not "undue." Thus, the Court agrees with the magistrate judge and overrules Gonzales's objection.

### ii.    Merits of the Statute of Limitations Defense

In addition to rebutting the substantive claims of negligence and Eighth Amendment violations, CoreCivic argues that Gonzales's case against it is time-barred. Gonzales responds by conceding that most of the conduct for which he seeks to hold CoreCivic liable occurred before his filing deadline but argues that at least one act occurred within the statutory period. That being the case, he argues, the "continuing violation" doctrine salvages these claims.

The relevant statute of limitations period for both claims against CoreCivic is two years. Colo. Rev. Stat. Ann. §§ 13-80-102(1)(a), 13-80-102(1)(g); *see also Wilson v. Garcia*, 471 U.S. 261, 268–69 (1985) (making state law applicable to federal claims without express limitations provisions). The standard tests for accrual are familiar. "Section 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is the basis for the action." *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994); *see also Johnson v. Johnson County Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991) (identical

language). Under this test, "a plaintiff need not understand the legal basis of his claim before the statute of limitations will begin to run." *Coleman v. Morall*, 64 F. App'x 116, 119 (10th Cir. 2003) Nor must he "know the full extent of his injuries." *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994). Rather, "a civil rights action accrues when *facts* that would support a cause of action are or should be apparent." *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995) (emphasis supplied; internal quotations omitted). Similarly, a state law cause of action for negligence accrues "on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence." *Morrison v. Goff*, 91 P.3d 1050, 1053 (Colo. 2004).

Gonzales has not provided facts to support any negligent acts by CoreCivic within the statutory period, so Count V fails. Wary that traditional limitations principles would also bar his constitutional claim,[15] Gonzales urges the Court to permit him recourse to the "continuing violation" doctrine, a principle which has never been applied to Section 1983 cases in the Tenth Circuit. Developed in the Title VII discrimination context, the doctrine acknowledges that sometimes "a plaintiff can experience continuing violations or wrongs such that a claim accrues for limitations purposes at the *culmination* of the continuous injury." *Burkley v. Corr. Healthcare Mgmt. Of Oklahoma, Inc.*, 141 F. App'x 714, 716 (10th Cir. 2005) (emphasis in original). Using the doctrine, a court may "look backwards to the entirety of a continuing wrong to assess its cumulative effect, so long as an injurious act falls within the statute of limitations period." *Id.* But the Tenth Circuit has never declared the doctrine suitable for Section 1983 claims. *See, e.g.,*

---

[15] CoreCivic posits three categories of allegedly unconstitutional or negligent treatments—delay of surgery, delay in receiving Synvisc, and denial of certain medical equipment—all of which were squarely within Gonzales's view for limitations purposes more than two years before he filed suit. (*See* ECF No. 193, at 14–16.) Gonzales does not rebut that he was aware of these circumstances more than two years before suing CoreCivic, but he pivots to the continuing violation doctrine to salvage his Section 1983 claim (but not his negligence claim; he has not alleged any act of negligence by CoreCivic within the statutory period). (*See* ECF No. 213, at 16–17.)

*Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018) (discussing the doctrine without applying it); *Colby v. Herrick*, 849 F.3d 1273, 1280 (10th Cir. 2017). In its review of other circuits' adoption of the doctrine for Section 1983 cases, the Tenth Circuit noted that, were it to apply, it is "triggered by continuing unlawful acts *but not by continuing damages* from the initial violation." *Vasquez*, 882 F.3d at 1277 (emphasis supplied; quoting *Colby*, 849 F.3d at 1280). Thus, as even the out-of-circuit authority cited by Gonzales indicates, to take advantage of the theory, a plaintiff must supply facts that create a genuine issue for trial as to "both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy." *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) (alteration in original; cited at ECF No. 213, at 16).

Here, assuming that this circuit would authorize recourse to the continuing violation doctrine for a Section 1983 claim, the Court would have to locate a post-January 12, 2016 act by CoreCivic that could support Gonzales's Eighth Amendment claim, but Gonzales supplies only one candidate: CoreCivic's May 3, 2016 confiscation of his metal knee brace. (ECF No. 213, at 17 (citing CSUMF ¶¶ 57–58).) Problematically, Gonzales does not dispute that having such a brace violates CDOC security policies or take issue with the wisdom of those policies. Neither does he show that he requested an exception from the CDOC chief medical officer so that he could have it in this instance. Nor does he dispute that CoreCivic actually *did* supply him with a non-metal Velcro knee brace. On the face of all the facts presented, this isolated deprivation of a potentially unsafe metal implement does not evidence any deliberately indifferent subjective state of mind necessary for Section 1983 liability to attach under these circumstances. Thus, the continuing violation doctrine would not save these claims even were it to apply. Both claims against CoreCivic are time-barred.

### b. Eighth Amendment Claims against CHP and Dr. Mix (Counts I and III)

Eighth Amendment protections extend to injuries caused by prison officials' "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). A claim of deliberate indifference includes both an objective and a subjective component. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The objective prong examines whether the prisoner's medical condition was "'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Id.* at 753. "The subjective prong examines the state of mind of the defendant, asking whether 'the official kn[e]w of and disregard[ed] an excessive risk to inmate health or safety.'" *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

### i. Sufficiently Serious Condition

First, the injury for which damages are claimed must be, objectively, "sufficiently serious," meaning that "a prison official's act or omission must result in the denial of the 'minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Tenth Circuit has previously "defined a *sufficiently serious medical need* as 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mata*, 427 F.3d at 753 (emphasis in original; quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). Additionally, in situations where, as here, the alleged harm is based on delay of treatment rather than denial, the inmate must show "substantial harm" as a result of the delay to have a viable claim. *Van Riper v. Wexford Health Sources, Inc.*, 67 F. App'x 501, 503 (10th Cir. 2003). This showing "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir.

2001). Here, armed with a minimal amount of testimony from Dr. Romeo that delay in knee surgery left Gonzales in an exaggerated osteoarthritic state with potentially lifelong consequences, the Court is satisfied that Gonzales provided enough to create a factual issue on the objective prong of his Eighth Amendment claim.

### ii. Conscious Disregard of Excessive Risk

Relevant here, liability attaches to prison officials who "intentionally deny[] or delay[] access to medical care or intentionally interfer[e] with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05. "[T]he responsible official must have a sufficiently culpable state of mind." *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir. 1996). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Thus, the "Eighth Amendment protects inmates from the 'infliction of punishment'—it does not give rise to claims sounding in negligence or medical malpractice." *Sherman v. Klenke*, 653 F. App'x 580, 586 (10th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. at 838). "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105. With these principles in mind, the subjective mental state necessary for a viable claim is something akin to criminal recklessness:

> [A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. . . . [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

> drawn that a substantial risk of serious harm exists, and he must
> also draw the inference.

*Farmer*, 511 U.S. at 836–37 (1994). As this Court has understood the standard in another case alleging Eighth Amendment violations by CHP and its reviewing doctors, "[t]he only way [a p]laintiff can hope to prove that [CHP or its doctor] was subjectively, deliberately indifferent . . . is to prove that the information [provided in a prior authorization request] showed an indisputably obvious need . . . [and that] that approval . . . was, in effect, the only reasonable decision that a physician could make." *Swan v. Physician Health Partners, Inc.*, No. 15-CV-0103-WJM-NYW, 2018 WL 4509528, at *4 (D. Colo. Sept. 20, 2018).

Turning to this case, Gonzales correctly notes that Dr. Mix was not providing medical care to him. But her role in evaluating the treatment options proffered by providers for their medical necessity and consistency with CDOC and nationally accepted guidelines necessarily involved medical analysis and review. *See Swan*, 2018 WL 4509528, at *4 (suggesting the CHP reviewer employed a medical opinion in his denial of a prior authorization request). In this capacity, Gonzales assigns her Eighth Amendment blame for various prior authorization request denials. He first highlights her denial of knee surgery based on her assessment that he had "good functional capacity," "very little pain," and that "the surgery was being performed for the indication of allowing [him] to resume sports." Gonzales finds these conclusions unbelievable because Dr. Romero's notes—which were supplied to Dr. Mix—contain language indicating his continued pain and inhibited daily activity. (*See* ECF No. 211, at 6.) But this view draws too selectively from the report, and only from Gonzales's subjective complaints contained therein. Objectively, the report recites Dr. Romero's observations of full and pain-free range of motion—without swelling, tenderness, or instability—and Gonzales's "wish[] to stay athletically active." Thus, all that report reflects is a patient claiming to be in pain and unstable but who did not

exhibit the same symptoms when examined. Whether or not it may have been medically incorrect to deny the elective surgery based on this information, doing so does not reveal the animus the Eighth Amendment requires, and it would not be reasonable for a jury to conclude the same when even the doctor who submitted the surgery request did not appeal its denial or suggest that the surgery was medically necessary.

Gonzales also points to Dr. Mix's January 7, 2016 denial of Synvisc—based on the determination that it does not alter the disease process—as evidence of deliberate indifference. But he does not dispute the truth of Dr. Mix's assessment, nor did his provider appeal her rejection. Instead, he argues that Dr. Mix's opinions do not reflect actual medical assessments, and he therefore insists that "Mix must rely on the judgment of the professionals requesting specific courses of their treatment." (ECF No. 211, at 5.) In other words, Gonzales all but expressly suggests that if Dr. Mix does not rubber-stamp a prior authorization request, a jury can infer her deliberate indifference to his serious medical needs. This argument is unsupported by the record, which reflects the medical analysis incumbent on Dr. Mix's prior authorization review. Gonzales's disagreement with Dr. Mix's conclusions concerning the appropriateness of using Synvisc to treat his pain—especially considering that he was receiving other forms of pain medication—amounts to a "difference of opinion with medical staff, which does not rise to the level of a constitutional violation." *Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993) (affirming dismissal of claims); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) ("It is obvious that [a difference of medical opinion] cannot serve as a basis for a cause of action."). That the denial of Synvisc represents a mere difference of medical opinion is highlighted by the slew of other similar injections Gonzales received at that time. The question is not whether Synvisc might have been more effective at relieving some of Gonzales's pain than

the medications he actually received, but whether he has supplied any evidence that reasonably supports the inference that Dr. Mix knew of and disregarded an excessive risk to his health or safety by precluding his access to a certain brand. On this point, Gonzales has nothing but unadorned hypotheses unsupported by any evidence of deliberate indifference. Therefore, Dr. Mix entitled to summary judgment in her favor.

### iii. CHP

Entities like CHP may be held responsible for the constitutional harms caused by their employees under the familiar—and rigorous—standard set forth in *Monell v. Department of Social Services of City of N.Y.* and its progeny, which assigns liability when constitutional violations flow from what amount to an authorized or official policy or custom. 436 U.S. 658, 691 (1978); *see also Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) ("[I]t is now well settled that *Monell* also extends to private defendants sued under § 1983.") (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (collecting circuit court cases)). But though *Monell* liability is not vicarious, a plaintiff must still personally experience some constitutional harm at the hands of an entity's employee in order to be liable, because "[i]f a person has suffered no constitutional injury at the hands of [an employee], the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (emphasis in original); *see also Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established, therefore, that a municipality cannot be held liable under section 1983 for the acts of an employee if a jury finds that the municipal employee committed no constitutional violation.").

Foreseeing the usual *Monell* hurdles related to evidencing a widespread practice so permanent and well-settled as to constitute a custom or usage having the force of law, Gonzales has filed—or drawn the Court's attention to—swaths of documents, statistics, and other cases purporting to evidence a pattern of additional instances of misconduct by CHP factually similar to the case at hand. But problematically, as the Supreme Court made clear in *Heller*, there can be no entity liability absent at least one anchoring constitutional violation committed against the plaintiff in question. Therefore, even assuming that Gonzales had shown that CHP had in place a policy or custom of arbitrarily denying medical treatment, it could not be liable to Gonzales absent evidence that he personally felt the result of the same. Thus, because summary judgment in favor of Dr. Mix is appropriate—and Gonzales does not allege or provide evidence of constitutional violations committed against him by any other CHP employee—judgment is also appropriate in favor of CHP on his Eighth Amendment claim.

### c. Negligence Claim against CHP and Dr. Mix (Count IV)

To survive a defendant's motion for summary judgment on a negligence claim, a plaintiff must raise a triable issue of fact on these elements: (1) that the defendant owed him a legal duty of care; (2) that the defendant breached that duty; (3) injury to himself; and (4) causation. *See Westin Operator, LLC v. Groh*, 347 P.3d 606, 612 (Colo. 2015).

Count IV comes in two forms. One asserts "a duty to exercise ordinary care for the safety and health of the prisoners" and breach by "systematically delaying and denying Mr. Gonzales medical care based on non-medical factors." The other alleges "a duty to properly hire, train, and supervise employees and agents to ensure [CHP and Dr. Mix] afforded adequate medical care to prisoners, including Mr. Gonzales" and a breach of "failing to establish and maintain a process to provide adequate outpatient medical treatment for prisoners like Mr. Gonzales." These theories

most closely sound in medical malpractice, or at least in the failure of licensed medical professionals to properly appropriate care.

> To prevail on a claim of professional negligence against a physician or other trained medical professional, a plaintiff must establish that the professional failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by that defendant. Further, unless the alleged negligence concerns subject matter within the common knowledge or experience of an ordinary person, both the standard of care and the defendant's failure to adhere to that standard must be established by expert opinion testimony of a qualified expert witness.

*Tracz ex rel. Tracz v. Charter Centennial Peaks Behavioral Health Sys., Inc.*, 9 P.3d 1168, 1173 (Colo. App. 2000). "It is only in unusual circumstances that a medical malpractice claim can be proven without the presentation of expert medical opinion to establish the proper standard of care against which the professional's conduct is to be measured." *Shelton v. Penrose/St. Francis Healthcare Sys.*, 984 P.2d 623, 627 (Colo. 1999) (permitting a medical negligence claim to move forward on a *res ipsa loquiur* theory); *see also McCafferty v. Musat*, 817 P.2d 1039, 1044 (Colo. App. 1990) ("Except in clear and palpable cases, expert testimony is necessary to establish the standards of acceptable professional conduct[.]"). Moreover, in a claim against a licensed professional, even if that professional is not strictly practicing the profession for which she has a license (e.g., medicine), the plaintiff is statutorily required to file a certificate of review, which

> applies to all claims against licensed professionals wherein expert testimony is required to establish the scope of the professional's duty or the failure of the professional to reasonably conduct himself or herself in compliance with the responsibilities inherent in the assumption of the duty.

*Martinez v. Badis*, 842 P.2d 245, 252 (Colo. 1992) (citing Colo. Rev. Stat. § 13-20-602 (requiring a certificate of review as condition precedent to bringing an action for damages against a licensed professional); *see also* Colo. Rev. Stat. Ann. § 13-20-601 ("[T]he certificate of

review requirement should be utilized in civil actions for negligence brought against those professionals who are licensed by this state to practice a particular profession and regarding whom expert testimony would be necessary to establish a prima facie case.").

Here, Gonzales's failure to hire/train/supervise theory is novel. CHP's review and appeal process, which provides up to least four levels of evaluation and permits appeals both inside and outside of CHP, is structurally sound. But rather than take aim at the system itself, Gonzales targets its use, arguing that CHP has "utterly failed to train CHP staff or CDOC medical providers on its prior authorization and medical-necessity appeals processes, thereby continuing a well-known system of arbitrary denials of needed medical care." (ECF No. 211, at 18–19.) But there are two problems with this theory. First, the Court is unable to locate any evidence on the record that could support a failure by CHP to train its own staff. Second, there is no cognizable legal duty that imbues a state actor with a responsibility to train, monitor, or supervise third-party users of its administrative systems. To the extent that CHP might have any duty to train third-party medical providers with respect to its prior authorization request process, that duty is *contractual*, and the only proper plaintiff for any breach of such an obligation would be CDOC, not Gonzales. There is no such duty sounding in tort, and therefore no viable negligence claim.

Gonzales's other theory—in which he argues that Defendants systematically beached a duty to provide him adequate healthcare through their own administration of the prior authorization request process—is more legally straightforward, yet not sufficiently supported. In order to understand whether Dr. Mix's and CHP's conduct fell below any medical standard of care or had any identifiable impact upon Gonzales's health, a jury would need the benefit of expert testimony. The practical necessity of expert testimony in cases like this should be clear. While Gonzales has proffered statistics and documents that reflect prior authorization denial

rates, other prisoner complaints of delay, and the like, there is nothing on the record that could inform a trier of fact as to where CHP's and Mix's conduct fits within a generally applicable standard of care or what that standard of care should be. Gonzales has not supplied any such expert, and—to the extent he can be entertained as one—Dr. Romeo has offered no medical rebuttal to any of Defendants' decisions. Moreover, Gonzales did not file the statutorily required certificate of review. Thus, Gonzales's negligence claims are legally incomprehensible, impermissibly unsupported, and barred as a matter of statute. Summary judgment is appropriate on Count IV.

## III. CONCLUSION

For the foregoing reasons, the unopposed motion for leave to file a reply brief (ECF No. 228) is **GRANTED**. Gonzales's objection (ECF No. 233) to the magistrate judge's order granting leave to amend is **OVERRULED**. CoreCivic's motion for summary judgment (ECF No. 193) is **GRANTED**. Dr. Mix's and CHP's motion for summary judgment is (ECF No. 189) is **GRANTED**. The Clerk shall enter judgment in favor of Defendants and close this case.

DATED this 20th day of May, 2019.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge